**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

MADELEINE C. STODOLA,                )
                                     )
       Plaintiff,                   )
                                     )
         v.                       )     CAUSE No.: 2:05-CV-464-PRC
                                     )
FINLEY & COMPANY, INC., et al.,      )
                                     )
       Defendants.                  )

**OPINION AND ORDER**

This matter is before the Court on a Defendants' Motion for Summary Judgment and/or Dismissal [DE 28], filed on December 5, 2007.  For the reasons stated below, the Court grants in part and denies in part the Defendants' Motion for Summary Judgment and/or Dismissal.

**PROCEDURAL BACKGROUND**

Plaintiff Madeleine C. Stodola ("Stodola") filed this cause of action on December 28, 2005, against Defendants Finley & Company, Inc. ("Finley"), Dennis Gill ("Gill"), and Allan Mills ("Mills") (collectively "Defendants").  In her Complaint, Stodola alleged that Defendants engaged in gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); disability discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); common law fraud; and defamation.

Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on January 20, 2006, alleging that Stodola failed to state a claim upon which relief can be granted.  The District Court agreed in part, and in an Order dated June 6, 2006, held that Gill and

Mills cannot be held liable in their personal capacities for Stodola's Title VII or ADA claims. Defendants also moved to dismiss the fraud claims, arguing that the representations underlying Stodola's claims were promises of future action or opinions, which Defendants argued are not actionable bases for claims of fraud in Indiana.  The District Court declined to rule on this contention, requiring instead that the parties fully brief the issue.  The District Court did dismiss one of Stodola's three fraud claims without prejudice, finding that she did not provide specific information in the allegation sufficient to comply with the pleading requirements of the Federal Rules of Civil Procedure.

On June 14, 2006, Stodola filed a First Amended Complaint, asserting the same causes of action that the original Complaint contained, and supplementing the claim of fraud that had been dismissed without prejudice by the District Court.  On June 26, 2006, Stodola filed a Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss.  On July 14, 2006, Defendants filed a Supplemental Brief on Issues Relating to Plaintiff's Fraud Claims.

On March 22, 2007, the Court Clerk reassigned this case to the undersigned Magistrate Judge upon full consent of the parties.

On April 17, 2007, the Court entered an Order granting in part and denying in part the Motion to Dismiss Stodola's fraud claims.  The Court divided the claims into two categories: actual fraud and constructive fraud.  Of the statements underlying Stodola's actual fraud claim, only a single statement concerned a then existing fact.  The Court found that statement to be a viable basis for a claim of actual fraud.  The remaining statements underlying Stodola's claim of actual fraud were found by the Court to be promises of future conduct, which fall squarely within the types of statements exempted from actual fraud in Indiana, and the Court granted Defendants' Motion to

2

Dismiss as to those statements.  With regard to Plaintiff's claim of constructive fraud, the Court found that her allegations properly alleged a cause of action.

On December 5, 2007, Defendants filed a Defendants' Motion for Summary Judgment and/or Dismissal, seeking an award of judgment as to all claims pending in this matter.  After several extensions of time, on February 7, 2008, Stodola belatedly filed a Memorandum of Plaintiff Madeleine Stodola in Opposition to Defendants' Motion for Summary Judgment.[1, 2] In her response, purportedly based on a review of the evidence that Defendants submitted in support of summary judgment, Stodola withdrew her claims for gender discrimination and defamation.  On February 13, 2008, Defendants filed a Reply of Defendants to Plaintiff's Response to Defendants' Motion for Summary Judgment.

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.  The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636.

[1]Defendants opposed Stodola's belated filing and moved the Court to strike the response.  After full briefing on the issue, the Court granted a Plaintiff's motion for leave to belatedly file a response and denied Defendants' motion to strike.

[2]In opposition to Defendants' Motion for Summary Judgment, Stodola filed a 44-page Plaintiff's Appendix of Material Facts Creating Genuine Issues in Opposition to Defendants' Motion for Summary Judgment.  While technically in compliance with the page limits prescribed in the Local Rules, the Appendix, in addition to facts, contains a substantial amount of legal argument.  Legal arguments are to be properly set forth in a legal brief.  In its consideration of Defendants' Motion for Summary Judgment and/or Dismissal, the Court will disregard any and all legal arguments contained in the Plaintiff's Appendix.

## FACTUAL BACKGROUND

While the parties largely agree as to the facts underlying this case, some details are in dispute. The following facts are taken from the pleadings, the parties' briefing on Defendants' Motion for Summary Judgment and/or Dismissal, and the documents submitted in support of or in opposition thereto. Any facts in dispute are construed in a light most favorable to Stodola, the nonmoving party.

Stodola is a college graduate who holds two degrees from Purdue University in restaurant management. Since earning her degrees in 1993 and 1995, Stodola worked as a cook and later as a manager at several restaurants. Throughout her career, Stodola has suffered from nystagmus, a congenital eye condition resulting from a lack of pigment in the retina and the iris. Nystagmus impairs vision and causes the eye to move in frequent rapid movements in an effort to capture images missed due to the lack of ocular pigment.

At all relevant times, Finley owned and operated twelve Wendy's restaurants in Indiana. Gill and Mills are employees of International Management Company ("International"), an entity that provides management services to Finley. Gill is International's Director of Operations, and Mills is one of International's District Managers. In November 2003, Stodola contacted Finley in response to an advertisement for employment as a Wendy's manager. Within a week, Defendants contacted Stodola and arranged for her to interview for a management position. Gill interviewed Stodola for approximately one hour and scheduled a second interview for the next morning. At her second interview, Mills interviewed Stodola. At the end of the interview, Stodola contends that she requested another meeting with Gill to discuss the effect, if any, of her nystagmus on a position with Finley.

4

On November 12, 2003, Gill met with Stodola for a second time. It was at this meeting that Stodola contends she informed Gill that she had a visual impairment. In addition, Stodola recalls that she showed Gill the specialized telescopic eyeglasses that she wore, and stated that she was concerned about being able to read the computerized customer order display screens used at Wendy's restaurants. Gill assured Stodola that reading the monitors was not an essential function of a manager. Stodola testified at her deposition that Gill then promised that Finley would install screens that displayed larger type. Stodola also contends that Gill promised that Finley would install paper ticket printers so she could access and review customer orders without relying on the monitors.

Stodola elected to visit a Finley Wendy's in Griffith, Indiana to see what she would experience as an employee. Gill testified at deposition that at this visit, Stodola told him that as long as she could wear her special glasses, her ability to view the monitors would not be a problem.

At a subsequent meeting, Stodola raised the issues of salary and work location. According to Stodola's deposition testimony, Gill listed Portage, Chesterton, and Valparaiso as possible work locations. Gill testified that he does not remember having this conversation.

On November 24, 2003, Stodola accepted Defendants' offer of employment as a co-manager trainee. Stodola negotiated one of the highest starting salaries for a co-manager trainee in the history of Finley and was paid as much as some of the Company's general managers. She was assigned to the Finley restaurant in Griffith, Indiana for training. The training program typically lasts ten weeks, during which trainees are required to write weekly reports for their District Manager outlining their progress and any problems they encounter. In her weekly reports, Stodola remarked favorably about the training.

Due to what Gill describes as "poor" performance, it took Stodola fourteen weeks to complete the training program. Defs.' Br. Summ. J., Ex. 32 at 3 (Gill Aff. ¶ 10). Gill stated that Stodola had great difficulty with the management aspect of training. Stodola completed her training with what she described in her final weekly report as a "sub-standard" performance. Defs.' Br. Summ. J., Ex. 19 (Feb. 28, 2004 weekly report). At deposition, Stodola recalled that the issue of her vision came up during training and that she told Mills during one session that she was unable to read the cash register overlay and as a result could not accurately enter orders.

Stodola contends that she never received a planned third phase of training. According to Stodola, the third phase of training would have addressed weekly paperwork to be completed in all Finley Wendy's, commonly referred to as "Monday paperwork." Monday paperwork is a weekly report that accounts for store inventory, processing, and any new hires. The paperwork is compiled and sent to Finley's home office. Stodola testified at deposition that she never received training regarding Monday paperwork; however, she conceded that she observed her trainer, Debbie, complete weekly administration procedures once or twice.

Following the completion of training, Stodola received her work assignment. Finley assigned Stodola to an assistant manager position at the Wendy's in LaPorte, Indiana. After two weeks, and at her choice, Stodola transferred to a Michigan City, Indiana Finley Wendy's. Between May 8, 2004, and October 21, 2004, Stodola received five Notices of Needed Improvement, which are forms issued by Finley managers to document employee performance shortcomings. On one occasion, Stodola issued a Notice of Needed Improvement to herself for a cash shortage. The four other notices were issued for slow drive-thru service times. Other than the self-issued notice,

6

Stodola refused to sign all of the notices.  With regard to the May 8, 2004, Notice of Needed Improvement, Stodola refused to sign the notice and contested its contents.

During this period of time, several general manager positions in the Finley organization became available.  Stodola was not promoted to fill any of the openings.

On November 30, 2004, Stodola attended a meeting with Gill and Mills.  At the meeting, Gill and Mills informed Stodola that she needed to improve her performance, otherwise Finley would terminate her employment.  Stodola attributed her performance problems to her poor eyesight and asked when larger type monitors would be installed.  At deposition, Gill testified that this was the first time he heard Stodola request a larger type monitor.  Gill and Mills agreed to look into a larger screen.  The meeting concluded with Gill promising to get back to Stodola with his decisions.

On December 3, 2004, Stodola filed a charge of discrimination against Finley with the Michigan City Human Rights Commission and the Equal Employment Opportunity Commission (both commissions collectively referred to as "EEOC").  Stodola alleged in the charge that Finley failed to accommodate her disability and had written her up for reasons associated with her disability.  Stodola further alleged that Finley promoted white males at a higher rate than females.

Gill sent a letter, dated December 27, 2004, to Stodola outlining his decisions from the November meeting.  The letter stated that the conditions set forth within were Stodola's last chance to succeed with Finley.  The letter informed Stodola that she would be reassigned to the Finley Wendy's in Merrillville, Indiana to work under general manager Mike Sutton ("Sutton").  The letter also assured Stodola that arrangements had been made for a larger flat-screen monitor to be installed in the Merrillville restaurant, a task that was completed in mid-January 2005.  The letter set forth a goal for Stodola to perform at a co-manager level within sixty days.

On January 11, 2005, Stodola filed a second charge of discrimination against Finley with the EEOC. Stodola alleged that after Finley had received notice of her first EEOC charge, it crafted a plan to set her up for termination or force her to quit. Specifically, Stodola charged that she had been transferred to the Merrillville Wendy's, which was forty-six miles from her home without being compensated for additional mileage, and still had not received any accommodations for her disability. Stodola also referred to Gill's December letter as evidence of discrimination.

Stodola signed Gill's letter on February 1, 2005, indicating that she had read the letter and understood its contents. She also submitted a written response, in which she denied many of the allegations contained in the letter.

In a memorandum dated March 16, 2005, sent from Sutton to Gill, Sutton wrote that Stodola's strengths were schedules, labor, bills, and week ending. Sutton listed running shifts as Stodola's only weakness. Sutton also wrote that aside from the operations leadership goals, Stodola had accomplished the goals set for her, and that the addition of new screens had improved her work and sped up drive-thru service times. Sutton concluded however that Stodola was not operating at a co-manager level, but was operating at an assistant level, and needed at least three additional months of training.

Gill agreed with Sutton's evaluation, and at deposition, testified that following the November 2004 meeting and December 2004 letter, Stodola's performance progressed in certain areas. However, on March 24, 2005, Defendants terminated Stodola. In a memorandum dated March 24, 2005, from Gill to Stodola, Gill emphasized Stodola's history of performance difficulties. Gill further stated in the memorandum, and testified at his deposition, that two specific incidents of inadequate performance led to Stodola's termination. First, in March 2005, Gill found Stodola

insubordinate for refusing to cook expiring meat.  Finley uses fresh meat, and when the meat approaches its expiration date, it is to be cooked for use in chili.  On the occasion in question, Stodola failed to cook ninety pounds of expiring meat, which then had to be thrown out.  Gill testified that another manager made a similar mistake two days earlier, and that all managers, including Stodola, had been advised to avoid future waste of meat.

Second, within days of the insubordinate uncooked meat incident, Stodola was found to have abandoned her job.  Each week, Finley district managers go to their assigned restaurants to retrieve Monday paperwork.   On Sunday March 20, 2005, Stodola was the closing manager at the Merrillville Wendy's and was to complete the Monday paperwork.  However, as of the morning of Monday, March 21, 2005, no Monday paperwork had been prepared for the Merrillville Wendy's. Later that week, Defendants terminated Stodola.

On March 28, 2005, Stodola filed a third charge of discrimination against Finley with the EEOC.  She alleged that Defendants retaliated against her after she filed her two earlier EEOC charges, and that they failed to accommodate her disability.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See*

Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

No heightened standard of summary judgment exists in employment discrimination cases nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wis. Dept. of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility are critical issues, frequently found in employment cases, that are genuinely contestable and not appropriate for a court to decide on summary judgment. *See id*. Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *See Wallace*, 103 F.3d at 1396.

11

## ANALYSIS

Stodola alleges that during her employment relationship with Finley, Defendants engaged in gender and disability discrimination and retaliation. Stodola also alleges that before she was hired Defendants engaged in fraud, and after she was fired committed acts of defamation. Defendants moved for summary judgment as to all claims. In her response to Defendants' Motion for Summary Judgment and/or Dismissal, Stodola withdrew her claims of gender discrimination and defamation. The Court will analyze the merits of each remaining claim separately.

## A.  ADA

The ADA protects a qualified individual from discrimination "because of the disability of such individual in regard to the job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Here, Defendants do not challenge Stodola's "disabled" status.[3] "Once a plaintiff has established that she is a qualified individual with a disability, she may show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (citing *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997).

Stodola asserts that Defendants engaged in both types of ADA discrimination in the following ways: (1) Defendants failed to reasonably accommodate her visual disability because they did not timely provide equipment that would allow her to view customer orders as they were being placed, and (2) because of her disability, Defendants treated her worse than other employees through

_____

[3]Defendants also state that, on the other hand, they do not concede that Stodola is disabled, as defined by the ADA.

unfair discipline, an unfair performance plan, and ultimately terminating her employment. With respect to Stodola's reasonable accommodation claim, Defendants first argue that they were not required to provide Stodola with a visual accommodation because the ability to view a customer order screen was not an essential function of her position. In the alternative, Defendants argue that Stodola's allegation of failure to reasonably accommodate is moot because Defendants complied with her requested accommodation. Addressing the disparate treatment charge, Defendants contend that their decisions with respect to Stodola's employment were made for legitimate, non-discriminatory reasons. The Court will analyze Stodola's ADA claims separately.

1.      *Reasonable accommodation*

To successfully assert a claim under the ADA for failure to provide a reasonable accommodation, a plaintiff must show that although her employer was aware of her disability, it failed to make a reasonable accommodation. *See Hoffman*, 256 F.3d at 572. The ADA includes the following examples of appropriate reasonable accommodations:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials, or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

At issue is whether Stodola's requested accommodation for a larger customer order screen involved an essential function of her job. An employer is required to reasonably accommodate a disabled employee with regard to the functions that are essential to the employee's position "but nothing in the statute requires an employer to accommodate the employee so that she may perform

any nonessential function that she chooses." *Hoffman*, 256 F.3d at 577. The Code of Federal Regulations defines essential functions as those "fundamental job duties of the employment position the individual with a disability holds . . ." 29 C.F.R. § 1630.2(n)(1). Evidence of whether a particular function is essential includes, among other things: the employer's judgment, a written job description, the amount of time spent performing the function, and the consequence of not requiring the employee to perform the function. *See* 29 C.F.R. § 1630.2(n)(3)(i)-(iv). With regard to the level of deference to be given to the employer's judgment as to what functions of a particular position are essential, "Congress . . . instructed courts to 'consider' the employer's judgment, not to defer to it, and certainly not to rubber-stamp it." *Nicholas v. Acuity Lighting Group, Inc.*, No. 1:03cv1005, 2005 WL 280341, at *9 (S.D. Ind. Jan. 4, 2005). The court is required to make an individual factual assessment of the job at issue. *See Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 (1987).[4]

There is an established body of case law analyzing whether various job functions qualify as essential. For example, in *Kielbasa v. Illinois E.P.A.*, the court relied on the employer's written job description and found that driving a motor vehicle, which the employer estimated accounted for 20% of the duties of the plaintiff's position, was a necessary function of the plaintiff's job, and therefore essential. *See* No. 02 C 4233, 2005 WL 2978717, at *6-7 (N.D. Ill. Nov. 3, 2005). In *Basith v. Cook County*, the court again relied largely on an employer job description. *See* No. 96 C 5596, 2000 WL

---

[4]The analysis of essential functions in this case is different than the typical analysis of the issue. Here, the parties' roles are reversed. Normally, a defendant employer argues that certain functions of a job are essential because the plaintiff then has the burden to prove that he or she is a qualified individual. To do so, the plaintiff must show that he or she is able to perform the essential functions of the job in question with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8). The defendant then typically argues that the plaintiff is unable to perform certain essential job functions and is therefore not qualified for the Act's protections. Here, Defendants argue to exclude a function of Stodola's job from inclusion as essential. While a somewhat unique procedural setting, much of the law on the issue of essential functions can still be applied to the facts of this case.

246255, at *9 (N.D. Ill. Feb. 24, 2000).  The court found that the plaintiff's pharmacy technician position included functions of delivering and stacking medication, which required walking, lifting, pushing, and pulling, and that the functions were essential.  *See id.*

Here, Defendants have not submitted a document purporting to be a job description for Stodola's position.[5]  The Court is required to look elsewhere.  In *Jones v. Cracker Barrel Old Country Store, Inc.*, the court went beyond the employer's job description and engaged in a factual analysis of the plaintiff's actual job duties, measuring the defendant's contentions against the plaintiff's.  *See* No. 04 C 1358, 2005 WL 589767, at *6 (N.D. Ill. Mar. 11, 2005).  The court ultimately denied the defendant's motion for summary judgment, finding in part that issues of material fact existed as to whether essential functions of the plaintiff's cashier position included activities such as climbing a stepladder or lifting materials above her head.  *See id.*

Whether considering a job description or the actual job duties, courts consistently restrict the category of essential functions to those functions that are necessary for an employee to complete the tasks required by the position, and to the exclusion of specific, particularized skills that are not required to perform the job at issue.  Lending credence to this formulation, in *Miller v. Illinois Dep't of Corrections*, in dicta, the court stated,

---

[5]However, in response to a Court order requesting production of supplemental evidence, Defendants produced a one-page document titled "Management Skills/Tasks Must Be Performed Consistently At Highly Effective To Be Considered For Next Position."  Defs.' Supp. Disc. Summ. J., Ex. 2.  The document is a grid listing four different management positions along the top (Manager, Co-Manager, Assistant, Shift) and five skills along the side (Leadership, People, Operations, Administration, Developmental), broken up into 54 specific tasks.  Of relevance here, is one of the tasks, titled "consistently observes full cycle for all positions."  *Id.*  This is the only task that relates to monitoring the flow of work within the restaurant.  This task is marked with an "x" in each of the four management position columns indicating that it is required of all managers.  However, the task does not specifically address viewing customer order screens.  Also, the document is dated December 21, 2004, well after Stodola's hiring, and is not relied upon by the parties in their briefs, and thus is not persuasive in the Court's analysis of what activities were essential to Stodola's position.

> If it is reasonable for a farmer to require each of his farmhands to be able to drive a tractor, clean out the stables, bale the hay, and watch the sheep, a farmhand incapable of performing any of these tasks except the lightest one (watching the sheep) is not able to perform the essential duties of his position.

107 F.3d 483, 485 (7th Cir.1997).

Here, the parties disagree as to whether viewing a screen displaying customer orders was an essential function of Stodola's position.  Relying on the deposition testimony and affidavits provided by Gill and Mills, Defendants submit that "[r]eading the display screens that contain customer orders is not an essential function of the job of either a co-manager or a general manager at a Wendy's restaurant."  Defs.' Br. Summ. J., Ex. 31, 2 (Gill Aff. ¶ 7).  Gill further stated that the "use of the display screens by a manager is counter-productive" because it takes up extra time that a manager could better use to delegate responsibilities within the restaurant and that "a manager who relies upon the display screens is likely to fail."  Defs.' Br. Summ. J. at 18 (citing Gill Aff. ¶¶ 6-7); Gill Aff. ¶ 7.

Stodola disagrees and contends that viewing the monitor that displays customer orders was an essential function of her job.  As part of her job, Stodola contends that she worked as operations lead.  Of central importance to that role, Stodola represents that she was required to perceive the flow of work.  Stodola submits that one of the primary ways to view the flow of work was by looking at the customer order monitors.  In support, Stodola refers to Gill's deposition testimony. Gill testified that being able to see the monitor was not an essential function of Stodola's job but stated that knowing what was going on around her, by stepping back and observing the restaurant, was essential.  *See* Defs.' Br. Summ. J., Ex. 1, 5 (Gill Dep. at 19).  Gill conceded, upon further questioning, that one way to know what was going on in the restaurant was to look at the screens. *See id*. at 20.

16

In furtherance of Stodola's argument, in a March 16, 2005 memorandum to Gill, Stodola's then General Manager, Sutton, wrote that the installation of new screens had improved Stodola's work and sped up drive-thru times.  Although Sutton did not directly address the issue of essential job functions, his specific mention of Stodola's improvement to International's President, Gill, suggests that the statement was an important comment regarding Stodola's job performance.

Stodola, through her testimony, briefing, documents submitted in support thereof, and the testimony of Gill, argues that viewing the monitors was sometimes important to her position.  She contends that, for purposes of the ADA, viewing the order screens was not just important, but essential.  Through the affidavits and deposition testimony of Gill and Mills, Defendants establish that Stodola was able to discharge her duties without viewing a customer order screen.  Defendants further establish that monitoring customer orders is only one role of a manager, and viewing customer order screens was only one way to carry out that role.[6]  Viewing customer order screens may have been an essential function of employees subordinate to Stodola who prepared customer orders and worked in more specialized roles.  But Stodola's duties as a manager were more diverse, and she was to some degree responsible for the restaurant as a whole.  While Stodola's job may have been made more difficult because she was unable to view customer orders, the Court distinguishes the degree of job difficulty from what functions were essential to the job.  The Court finds that Defendants have established, for purposes of summary judgment, that viewing customer order screens was not an essential function of Stodola's position.  The Court therefore grants summary judgment to Defendants on Stodola's ADA claim for failure to reasonably accommodate her

---

[6]In their briefing, Defendants refer to Stodola as a co-manager.  In other documents Stodola is identified as an assistant manager.  In its analysis, the Court will construe Stodola simply as a manager.  Should any differences arise between the co-manager and assistant manager positions, the Court will analyze Stodola under both positions, and, as this is a factual issue, proceed under the analysis most in her favor.

disability.  The Court need not address the issue of whether the timing of Defendants' accommodation was reasonable.

2.   *Disparate treatment*

Reviewing the record, it is difficult to discern Stodola's theory of ADA disparate treatment. The First Amended Complaint does contain several allegations of disparate treatment discrimination, but those allegations are primarily tailored to a Title VII claim, which Stodola has since abandoned. Nevertheless, both parties briefed the issue of ADA disparate treatment discrimination in their summary judgment filings.  Under the liberal pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, the Court will now glean what it can from the record and consider the claim of ADA disparate treatment discrimination.

Stodola's theory of disparate treatment, based on the Court's piecing together of her pleadings, deposition testimony, summary judgment briefing and documents submitted in support thereof, is that Defendants discriminated against her by transferring her to the Merrillville Wendy's, disciplining her for slow drive-thru service times, and terminating her employment.  Stodola may prove disparate treatment discrimination using either the direct method or the *McDonnell Douglas* burden-shifting method, also known as the indirect method.  *See McDonnell Douglas v. Green*, 411 U.S. 792, 793 (1973).  The Court will analyze Stodola's claim first under the direct method.

a.  Direct method

The direct method is satisfied if the plaintiff makes a showing through either direct or circumstantial evidence (direct evidence is but one avenue available to assert a claim under the confusingly named direct method) that "will prove the particular fact in question without reliance upon inference or presumption." *Hoffman*, 256 F.3d at 574 (quoting *Plair v. E.J. Brach & Sons,*

18

*Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)).  Here, Stodola finds herself, as do the vast majority of

employment discrimination plaintiffs, without direct evidence.

Turning to circumstantial evidence, Courts generally recognize three types of such evidence

in employment discrimination cases: (1) collective "bits and pieces" evidence that suggests

discriminatory motive, such as suspicious timing, ambiguous statements, and problematic behavior

toward other employees in the protected group; (2) evidence that similarly situated employees not

in the protected group systematically received more favorable treatment; and (3) evidence that the

plaintiff was qualified for the job but was replaced by a nondisabled person and that the employer's

reason for a difference in treatment is unworthy of belief, or in other words, is pretext.  *See Nichols*

*v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007); *Troupe v. May Dep't Stores*

*Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

In recent years, courts in this Circuit have used the term of art "convincing mosaic" to

describe the amount of circumstantial evidence necessary to survive summary judgment under the

direct method.  Should the pieces of circumstantial evidence together compose a "'convincing

mosaic of discrimination against the plaintiff,'" the plaintiff can withstand summary judgment.

*Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (quoting *Troupe*,

20 F.3d at 737).  In *Sylvester*, the court of appeals clarified that a convincing mosaic is only one way

to defeat summary judgment under the direct method using circumstantial evidence.  *See* 453 F.3d

at 905.  The female plaintiff in *Sylvester*, alleging retaliation, showed that two of four signatories

to a letter complaining of perceived discrimination were fired soon after signing the letter, that her

performance was raised as an issue soon after the letter appeared, and that she was fired not for her

performance but for reacting poorly to news that the other employees had been terminated.  *See id.*

19

The court found that this evidence did not form a convincing mosaic. *See id*. at 904. Nevertheless, the court held that because a reasonable jury could conclude that the defendant acted discriminatorily, the plaintiff's claim survived summary judgment. *See id*. More simply, to survive summary judgment, the circumstantial evidence offered by the plaintiff "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *see e.g. Volovsek v. Wis. Dept. of Agr., Trade & Consumer Protection*, 344 F.3d 680, 690 (7th Cir. 2003) (finding that female plaintiff created a genuine issue of material fact under direct method on her claim of sex discrimination when she allegedly overheard her supervisor make a single comment about "keeping them barefoot and pregnant" immediately after he had denied her requested promotion).

Stodola relies on the first and third types of circumstantial evidence. She claims that (1) the purported reasons given by Defendants for her termination are pretext, and that Defendants actually terminated her due to her visual disability, and (2) the timing of the adverse employment actions taken against her is sufficient evidence of discrimination. As to Stodola's first brand of evidence, pretext is defined as "a deliberate falsehood." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (citations omitted). "An honest mistake, however dumb, is not [pretext], and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage." *Id*. Only the honesty of the employer's stated reason for the adverse action is of concern to the court at summary judgment. *See id*. (citing *Balderston v. Fairbanks Morse Engine Div.*, 328 F.3d 309, 323 (7th Cir. 2003)). "If the stated reason is not the actual one, it is a pretext even if it had some basis in fact-even if it might have induced some employers to fire or take other adverse action against the plaintiff but did not induce this employer to do so." *Forrester*, 453 F.3d at 419.

20

The Court first examines Defendants' purported legitimate, non-discriminatory reasons for taking adverse employment actions against Stodola. Defendants rely on the December 27, 2004, letter sent from Gill to Stodola, placing her on a performance plan and transferring her to the Merrillville Wendy's. Defendants contend that the letter evidences a history of problematic work performance. Gill explains his justification for the performance plan and work transfer imposed upon Stodola in the following excerpt:

> Based on your experience in the restaurant industry, I expected you to be farther along at this time. . . I am speaking specifically of leadership. i.e., taking initiative, setting the example for subordinates, picking up administrative tasks with out [sic.] being asked, running an effective shift on a consistent basis. This year we rolled out the Operations Leader Program. . . . You struggle with the premise as others do; however, you are not making steady improvement with this program at the same pace as others. . . . After measuring both your goals and that of our company, [Mills] and I have developed the basics of a plan we believe will address both of our needs. . . . [I]t is you who must execute the plan to succeed and remain employed with our company. . . . [T]his is the final opportunity to succeed at Wendy's. Absent success in this endeavor the employment relationship will be terminated.

Defs' Br. Summ. J., Ex. 26, 1-3. Further, in his deposition and affidavit, Gill gave testimony and provided statements consistent with the December 27, 2004 letter. Gill unwaveringly asserts that the performance plan and the job transfer resulted from performance concerns, and in an effort to correct and improve shortcomings in Stodola's work. With regard to her termination, Gill asserts that he made this decision based on two misdeeds by Stodola, the first an act of insubordination (failing to cook expiring meat), the second an act of job abandonment (failing to complete the Merrillville Wendy's Monday paperwork).

Stodola vigorously argues that Defendants' stated reasons for her termination are pretext, and points to what she contends is a conflict in explanations offered at different times by Defendants. In a letter dated July 13, 2005, Carmen Wolfe, an EEOC investigator, wrote a letter to

21

Shaw R. Friedman, who was then legal counsel for Stodola.  In the letter, Wolfe included Defendants' EEOC Position Statement, which she represented had been sent to her under separate cover by counsel for Defendants.  Within the Position Statement, Defendants referred to on the job performance issues and summarized Stodola's termination as follows: "It is this type of misconduct together with Ms. Stodola's unwillingness or inability to meet the goals and objectives of the performance improvement plan that resulted in the decision of Mr. Gill to terminate the employment relationship."  Pl.'s Resp. Br. Summ. J., Ex. 5, 16.[7]  Stodola contrasts that statement with a quote contained in Defendants' brief in support of summary judgment.  Defendants quote Gill's deposition, taken on September 11, 2007, in which he said, "She wasn't fired for not doing her [performance improvement] plan.  She was fired for abandonment of job . . ."  Defs.' Br. Summ. J. at 7 (quoting Gill Dep. at 68).

That Defendants offer several reasons for Stodola's termination does not alone show pretext. However, because the stated reasons are in conflict with each other, that may cast sufficient doubt upon Defendants' purported justifications to allow Stodola's claims to survive summary judgment. *See Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676-78 (7th Cir. 2003) (the court found the defendant's two independently legitimate reasons for failing to rehire the plaintiff unworthy of credence, in part because the reasons were inconsistent, but also due to the defendant's timing in disclosing its second justification, which for the first time was asserted in defendant's summary judgment reply brief); *Creal v. Springhill Ford, Inc.*, No. 06 C 0175, 2007 WL 3120106, at *6 (N.D.

---

[7]Defendants submit a one sentence argument that Wolfe's letter is inadmissible hearsay and cannot be used to create a genuine issue of material of fact, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  However, the Court finds that the section of Wolfe's letter relied on by Stodola is an excerpt taken from a letter written by counsel for Defendants, and thus the letter is not hearsay, but is an admission of a party-opponent, and is admissible. *See* Fed. R. Evid. 801(d)(2)(D).

Ill. Oct. 19, 2007) (". . . given that an employer can terminate an employee for multiple, legitimate reasons, the fact that the record contains more than one statement of why [the plaintiff] was fired only helps [the plaintiff] if those statements are inconsistent with one another or the underlying facts in such a way as to suggest a lie.").

Here, Defendants advance two justifications for Stodola's termination.  Both concern issues with Stodola's performance.  Neither reason is itself discriminatory.   However, Gill's statement at deposition that Stodola was not fired because she failed to comply with the performance plan directly contradicts Defendants' representation in their Position Statement that Stodola was fired because she did not comply with the performance plan.   The presence of directly inconsistent statements raises a question as to their truthfulness.  To date, the contradiction has not been resolved. Defendants' argument that Stodola was terminated for legitimate performance issues does not resolve the discrepancy.   The specter of pretext lingers.   Therefore, the Court finds that the contradiction is sufficient to cast doubt upon the veracity of Defendants' justifications.

In addition to Defendants' inconsistent justifications, Stodola points to the "suspicious" timing of their adverse employment actions.[8]  The timing of events is as follows: Stodola met with Gill and Mills on November 30, 2004, and during their meeting discussed her disability and the need for a larger monitor that would allow her to view customer orders.  On December 3, 2004, Stodola filed a charge of discrimination with the EEOC, complaining of both disability and gender discrimination.  On December 13, 2004, Defendants allegedly received service of the EEOC charge. On December 27, 2004, Gill issued a performance plan to Stodola, pursuant to which she was

---

[8]The Court engages in a complete analysis of the law concerning temporal proximity in its analysis of Stodola's claims of retaliation, *infra*.  The analysis *infra* analyzes timing in the retaliation context, which is slightly different than the disparate treatment context.  In this section, the Court examines timing as one potential piece of evidence of discrimination.

transferred to the Merrillville Wendy's and given sixty days to improve her performance or face termination.  On January 11, 2005, Stodola filed a second EEOC charge, complaining that the performance plan was an act of retaliation.  On March 20, 2005, Defendants terminated Stodola's employment.

The fourteen days that passed between Defendants' receipt of Stodola's first EEOC charge and their issuance of a letter transferring her to a restaurant forty-six miles from her home and placing her on a performance plan with a sixty day ultimatum for improvement is a short amount of time.  Defendants point to the fact that Stodola had a previous history of inadequate performance with the company, documented in five separate Notices of Improvement.  Because the Notices of Improvement were  issued before Stodola filed her first EEOC charge, Defendants argue that any taint of discrimination is removed.  Gill documented these issues in his December letter.  The Court is not fully convinced by Defendants' reasoning.  While Defendants previously issued warnings to Stodola, they never took any action against her.  Only after Stodola filed a charge with the EEOC, making her disability an issue that Defendants would have to address, did Defendants find it necessary to take action.  And the action taken was substantial, a lengthy transfer, and a sixty day ultimatum.  The timing of events, combined with the inadequate explanations for Stodola's termination, are such that a reasonable jury could conclude that Stodola's disability was the cause of adverse employment actions taken against her.  Thus, the Court finds that the circumstances surrounding Stodola's employment with Defendants raises factual issues that cannot be resolved at the summary judgment stage.  Having found that Stodola created a genuine issue of material fact under the direct method, the Court need not proceed with an analysis of her claim under the *McDonnell Douglas* framework.

24

b.  Same actor doctrine

Defendants attempt to shield any potential liability for disparate treatment discrimination through use of the same actor doctrine.  The same actor doctrine is described in *Young v. Lincoln National Corp.*, as "in cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." 937 F. Supp. 1326, 1337 (N.D. Ind. 1996) (quotations and citations omitted).  The court found that, based on the facts of the case before it, it "seems rather suspect to claim that the [manager who hired the plaintiff and subsequently raised his performance rating] had suddenly developed an aversion to older people two years later."  *Id.* at 1338 (quotations and citations omitted).  In this case, Defendants urge the Court to apply the same actor doctrine to Gill, who decided to both hire and then fire Stodola.

Stodola relies on the more recent United States Court of Appeals for the Seventh Circuit decision in *Johnson v. Zema Systems Corp.*, and urges the court to disregard the same actor doctrine. 170 F.3d 734, 744-46 (7th Cir. 1999).  The *Johnson* court casts doubt upon the assumptions underlying the same actor doctrine, reasoning that a manager might hire a member of a protected class expecting that person to work or behave a certain way, only to find out that the employee does not conform to the manager's preconceived stereotypes.  *See id.* at 745.  Should the manager then take an adverse employment action against that employee because the employee does not fit the manager's notions of how a person within the employee's protected class should act, the *Johnson* court reasoned, the manager would be subject to an action for discrimination.  *See id.*  The court

concluded, "It is for these reasons that the same-actor inference is unlikely to be dispositive in very many cases." *Id*.

Relying on the cogent analysis in *Johnson*, the Court finds the same actor doctrine unpersuasive. Here, Gill hired and fired Stodola. However, Gill's role as the sole decision maker throughout Stodola's course of employment does not persuade the Court that discrimination played no role in Stodola's termination. Gill may have had certain performance expectations of Stodola. Should Stodola not have met those expectations due to her eyesight disability, and Gill fired her for that failure, his decision could fall within the realm of unlawful discrimination. The Court finds that Stodola created a genuine issue of material fact under the direct method of proof for her claim of ADA disparate treatment discrimination.

## B. Retaliation

In her First Amended Complaint, Stodola alleges that Defendants retaliated against her for filing discrimination charges with the EEOC by transferring her to the Merrillville Wendy's, implementing the performance plan, and terminating her. Stodola asserts claims for retaliation under Title VII and the ADA. In response, Defendants argue that Stodola failed to meet the requisite burden of proof, and that summary judgment in their favor is appropriate.

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to discriminate against an employee "because [she] has opposed any practice made an unlawful employment practice by [the statute], or because [she] has made a charge, testified, assisted, or participated in [a Title VII] investigation, proceeding, or hearing . . ." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are to be examined in the same manner as retaliation claims filed under the ADA. *See Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006). Just as with claims of ADA

discrimination, a plaintiff can establish a prima facie case of retaliation using either the direct or indirect method. *See Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

1.      *Direct method*

Under the direct method, the plaintiff must show (1) evidence that she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *See Burks v. Wis. Dept. of Trans.*, 464 F.3d 744, 758 (7th Cir. 2006). Here, Stodola can establish without challenge that she engaged in a protected activity and was subjected to an adverse employment action. On December 3, 2004, January 11, 2005, and March 28, 2005, Stodola filed charges of discrimination with the EEOC, all protected activities. And on March 20, 2005, Defendants terminated her employment, the clearest adverse employment action. Further, Defendants do not challenge Stodola's claims that the work transfer to Merrillville and the performance plan, both implemented in the December 27, 2004, letter sent by Gill to Stodola, were adverse employment actions. Attempting to establish a causal link, Stodola has no direct evidence that she was subjected to an adverse employment action in retaliation for filing charges with the EEOC. Rather, Stodola relies on circumstantial evidence in the form of the timing between her filing of EEOC charges and the adverse employment actions taken by Defendants. The court now specifically analyzes the issue of timing in the context of a retaliation claim.

Generally, "[s]peculation based on suspicious timing alone . . . does not support a reasonable inference of discrimination." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). "[A]s the temporal distance between [the] protected expression and the adverse action increase[s], it is less likely that there is a causal link between the two events." *McKenzie v. Ill. Dep't of Transp.*,

27

92 F.3d 473, 485 (7th Cir. 1996). "The mere fact that one event preceded another does nothing to prove that the first event caused the second." *Id*. In addition to suspicious timing, the plaintiff must also "put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination and termination." *Burks*, 464 F.3d at 759 (citing *Suazek*, 202 F.3d at 918).

An exception to the general rule is seen in *McClendon v. Indiana Sugars, Inc.*, a case in which the court found that an adverse action that occurred two days after the plaintiff engaged in a protected activity was a sufficiently short passage of time to support an inference of discriminatory motive. 108 F.3d 789, 796-97 (7th Cir. 1997).[9] *McClendon* has been construed narrowly. In *Squibb v. Memorial Medical Center*, the court decided that a situation in which months had passed between the protected activity and the adverse employment action did not merit discussion of "*McClendon's* narrow exception." 497 F.3d 775, 787 n. 9 (7th Cir. 2007).

No bright line has been established as to what length of time must pass after a protected activity before an adverse employment action is free from any suggestion of a causal link. *Compare EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (found to be no genuine issue of material fact where six weeks passed between protected activity and termination); *and Kaveler v. U.S. Bancorp Ins. Serv., LLC*, No. 06-CV-04, 2007 WL 2714115, at *8 (S.D. Ill. Sept. 17, 2007) (finding that six week interval between letter complaining of employment discrimination and termination created a genuine issue of material fact as to causal connection). In *Stone*, the court

---

[9]In their reply brief, Defendants inaccurately summarize *McClendon* as upholding "summary judgment for the employer . . . despite only 2 or 3 days between the protected activity and the discharge." Defs.' Rep. Br. Summ. J. at 7-8. *McClendon* ultimately affirmed the district court's award of summary judgment to the defendant employer; however the court first found that the temporal proximity satisfied the plaintiff's burden to establish a prima facie case of retaliation.

held that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." 281 F.3d at 644. More recently, courts have dropped the word "rarely" and made the statement in *Stone* a blanket abdication of relying solely on temporal proximity. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007) (discussing the direct method, the court found that "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim."); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (citing *Stone*, 281 F.3d at 644) (". . . it is clear that 'mere temporal proximity' is not enough to establish a genuine issue of material fact."); *Popejoy v. Cass County Comm'rs*, No. 3:05-CV-694, 2008 WL 181124, at *9 (N.D. Ind. Jan. 17, 2008) (Miller, J.) (citing *Stone*, 281 F.3d at 644).

Here, Defendants implemented the transfer and improvement plan fourteen days after Stodola filed her first EEOC charge, and announced their decision to terminate her employment approximately two months after the filing of her second EEOC charge. Stodola contends that the temporal separation between her EEOC charges and Defendants' adverse employment actions amounts to "extremely suspicious timing." Pl.'s Br. Resp. Summ. J. at 21. The timing issue in this case lacks the nearly contemporaneous proximity seen in *McClendon*. The Court finds the intervening passages of time in this case are such that temporal proximity alone is an insufficient basis for Stodola to establish the causation requirement of a prima facie case of retaliation.

The Court proceeds to examine other potential evidence of a causal link. Stodola does not argue that Defendants' multiple justifications for her termination are evidence of a causal link, and the Court does not consider the issue here. Rather, Stodola contends that in addition to timing, evidence of a causal link is further established because "Defendants either ignored or [did not] care

about the fact that Stodola had never been fully trained and certified as an OPS leader and that employees generally were not disciplined for having poor service window times anyway." *Id.* The Court finds that Stodola's alleged lack of training does not support a theory of retaliation under the direct method. Stodola's training occurred before she started work, filed an EEOC charge, or otherwise complained about any perceived discrimination. Thus, no retaliatory act, under this time line, could have occurred. In addition, the Court finds that Defendants' discipline of Stodola for poor drive-thru delivery service times was not retaliation. All five Notices of Needed Improvement, the last being issued on October 21, 2004, were issued before Stodola engaged in any protected activity. Finally, Stodola contends that Defendants only started to complain about her job performance in a way that could result in dismissal after she requested a meeting with Gill and Mills and requested an accommodation. However, Stodola received the five Notices of Needed Improvement prior to the meeting. The Court finds that Stodola's additional evidence of retaliation fails under the direct method.

2.   *Indirect method*

Under the second method of proof, the indirect method, the plaintiff must show that after she engaged in a protected activity, she was subjected to discrimination even though she satisfactorily performed her job, and that no similarly situated employee who did not engage in a protected activity was subject to an adverse employment action. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004).[10] A plaintiff's retaliation claim fails if she is unable to satisfy any single element of the prima facie case. *See Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007). If the plaintiff is able to assert a prima facie case, an employer can defeat a claim for

---

[10]Establishing a causal link is not a requirement of a prima facie case of retaliation under the indirect method of proof. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004).

retaliation if it can present "unrebutted evidence of a noninvidious reason for the adverse action . . ." *Stone*, 281 F.3d at 644; *see also Hudson*, 375 F.3d at 559.

As noted above, Stodola can establish that she engaged in protected activity and that she was subjected to adverse employment actions.  However, Stodola's claim of retaliation is derailed under the indirect method because she cannot show that she satisfactorily performed her job.  As noted above, prior to the first alleged adverse employment action, the issuance of the December 27, 2004, performance plan and transfer, Stodola received five Notices of Needed Improvement.  Four of the notices were issued for substandard drive-thru service time, the fifth was self-issued for a cash drawer shortage.  Further, in her initial training program, which was scheduled to last ten weeks, Stodola took fourteen weeks to complete the program and finished her training with a performance that she described as sub-standard.  Based on the foregoing incidents, the Court finds that Stodola's job performance was not satisfactory.  Thus, Stodola is unable to establish a prima facie case of retaliation using the indirect method and her claim fails.  The Court grants Defendants' Motion for Summary Judgment as to Stodola's claims of retaliation.

### C. Fraud

Stodola's final remaining claims allege that Defendants engaged in actual and constructive fraud through representations made to Stodola prior to her employment.  Defendants contend that under the pertinent Indiana legal standards, they are entitled to summary judgment.

1.    *Actual fraud*

On April 17, 2007, the Court issued an Order that dismissed all but one of Stodola's claims of actual fraud.  The sole remaining claim alleges that Gill committed actual fraud when he told

Stodola during a November 12, 2003, job interview that ability to see screens displaying customer orders was not an essential function of the job for which Stodola was a candidate.

Because much of the legal framework for a claim of actual fraud was set forth in the Court's Order ruling on Defendants' Motion to Dismiss, the Court will now provide an abbreviated summation. To prove actual fraud under Indiana law, a plaintiff must show (1) a material representation of past or existing fact; (2) falsity of the representation; (3) that the defendant made the representation with knowledge or reckless ignorance of its falsity; (4) plaintiff's reliance on the representation; and (5) injury to the plaintiff proximately caused by the representation. *See Youngblood v. Jefferson County Div. of Family & Children*, 838 N.E.2d 1164, 1169-70 (Ind. Ct. App. 2005).

The Court previously considered Stodola's allegations of actual fraud in the context of a motion to dismiss, and whether they met the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. The Court now analyzes Stodola's remaining actual fraud claim under the more stringent summary judgment standard. Defendants assert that Stodola has failed to show that Gill made a statement that he knew to be false or recklessly disregarded the possibility that it was false. In support of summary judgment, Gill submitted an affidavit in which he addresses the allegedly fraudulent statement he made to Stodola during the interview. In his affidavit, Gill provides, "When I told this to Stodola, I knew and believed my statements to be true." Defs.' Br. Summ. J., Ex. 32, at 2. In the following paragraph of his affidavit, Gill states, "Reading the display screens that contain customer orders is not an essential function of the job of either a co-manager or general manager at a Wendy's restaurant." *Id*. Thus, through his affidavit, Gill clearly affirms his belief that seeing display screens was not an essential function of Stodola's job.

32

In response, Stodola contends only that Gill "should have known that the statement was false if she could not have routine access to a headset." Pl.'s Br. Resp. Summ. J., at 24. Stodola relies on a statement that Gill made during his deposition. Gill stated that if other methods used to monitor customer orders were not working, Stodola may have used the customer order screens to observe activity in the restaurant. The statement is evidence that Gill had knowledge that Stodola may, on occasion, need to see a screen, not that the screen was an essential function of her job. These are distinct showings. To assert a claim for actual fraud, Stodola must establish the second showing, and show that Gill knew or recklessly disregarded the falsity of a statement that viewing the screens was not an essential function. The Court finds that Stodola is unable to show that Gill had the requisite *mens rea*. As a result, Stodola's claim fails and Defendants are awarded summary judgment on Stodola's claim for actual fraud.

2.    *Constructive fraud*

Stodola alleges that Gill engaged in constructive fraud when he verbally anticipated that Stodola would manage her own store within six months of her hire. This claim survived Defendants' Motion to Dismiss with the Court finding that a cause of action based on a statement of future conduct can exist under the label of constructive fraud.

The Court will summarily state the relevant Indiana legal standards that apply to constructive fraud. To prevail on a claim of constructive fraud, a plaintiff must prove (1) a duty owed to the plaintiff by virtue of the relationship between the parties; (2) representations or omissions of facts made in violation of that duty or silence when a duty to speak exists; (3) plaintiff's reliance on the representation or silence; (4) that an injury occurred as a proximate result; and (5) that the defendant gained an advantage at the expense of the plaintiff. *See Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind.

1996).  Notably, constructive fraud does not require a plaintiff to prove that the defendant acted with

an intent to deceive.  *See Wright v. Pennamped*, 657 N.E. 2d 1223, 1233 (Ind. Ct. App. 1995).

Rather, fraud is inferred based on the relationship of the parties and the surrounding circumstances.

*Id*.  The relationship element is satisfied by proof of a fiduciary or confidential relationship between

the parties, proof of some other special relationship that would impose an added duty, or when

circumstances exist that are likely to result in injustice such that the law will find fraud despite the

absence of fraudulent intent.  *See Remmers v. Remington Hotel Corp.*, 56 F. Supp. 2d 1046, 1057

(S.D. Ind. 1999) (citing *Wright*, 657 N.E. 2d at 1233; *Hardy v. South Bend Sash & Door Co.*, 603

N.E.2d 895, 901 (Ind. Ct. App. 1992); *Comfax v. North Am. Van Lines, Inc.*, 587 N.E.2d 118, 125

(Ind. Ct. App. 1992)).

     Defendants contend that Stodola's constructive fraud claim fails because she cannot show

that a special or fiduciary relationship exists as required to establish the duty element.  In support,

Defendants refer to *Remmers*, a case that the Court described in detail in its Order ruling on

Defendants' Motion to Dismiss.  To summarize, in *Remmers*, the plaintiff, a general manager of one

of the defendant's hotel properties, alleged that the defendant engaged in constructive fraud by

promising him at least one year of work and firing him less than a year into his employment.  *See*

56 F. Supp. 2d at 1057-58.  The court found that the plaintiff's ability to bargain for himself, his

history as a hotel general manager, and his general experience in the hotel industry and its business

practices, put him in a position that would not give rise to a special relationship or place an added

duty on the defendant.  *See id*. at 1058.  The court concluded that the defendant was not in such a

position of power whereby it could gain a position of comparative power and influence the plaintiff

by making promises to gain his reliance.  *See id.*

34

The Court finds the instant case to be analogous to *Remmers*.  Here, Stodola has past restaurant management experience and two degrees from Purdue University in the field of restaurant management.    Further, she demonstrated her business acumen by engaging Defendants in negotiations as to the conditions of her employment before accepting their job offer, which yielded one of the highest starting salaries Finley ever paid a co-manager.  Because Stodola had extensive relevant experience and was capable to negotiate on her own behalf prior to agreeing to work for Defendants, the Court finds that no special relationship existed as is contemplated by Indiana constructive fraud precedent.  Thus, no duty can be imposed upon Defendants and Stodola's claim for constructive fraud fails.  Defendants are granted summary judgment on Stodola's claim for constructive fraud.

## CONCLUSION

Therefore, the Court now **GRANTS IN PART AND DENIES IN PART** the  Defendants' Motion for Summary Judgment and/or Dismissal [DE 28].  The Court **ORDERS** that Stodola's claims for Title VII gender discrimination and defamation are **DISMISSED**.  Further, the Court **GRANTS** summary judgment in favor of Defendants as to the following claims: failure to make a reasonable accommodation, as required by the ADA; retaliation in violation of Title VII and the ADA; and actual and constructive fraud.  The Court **DENIES** Defendants' Motion for Summary Judgment as to Stodola's claim for disparate treatment discrimination under the ADA, in accordance with the reasoning set forth in this Opinion.

SO ORDERED this 24th day of March, 2008.

 s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY

UNITED STATES DISTRICT COURT

cc:      All counsel of record