**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| MADELEINE C. STODOLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE No.: 2:05-CV-464-PRC |
| | ) | |
| FINLEY & COMPANY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter is before the Court on a Defendants' Motion to Reconsider Summary Judgment Order [DE 49], filed by Finley & Company, Inc. ("Finley"), Dennis Gill ("Gill"), and Allan Mills ("Mills") (collectively "Defendants") on March 31, 2008. On April 15, 2008, Plaintiff Madeleine C. Stodola ("Stodola") filed a Plaintiff's Memorandum in Opposition to Defendants' Motion to Reconsider Summary Judgment Order. Defendants failed to file a reply. For the reasons set forth herein, the Court grants the Defendants' Motion to Reconsider.

**PROCEDURAL BACKGROUND**

Stodola filed this cause of action on December 28, 2005, alleging that Defendants engaged in gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); disability discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); common law fraud; and defamation.

Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on January 20, 2006, alleging that Stodola failed to state a claim upon which relief can

be granted. The District Court agreed in part and in an Order dated June 6, 2006, held that Gill and Mills cannot be held liable in their personal capacities for Stodola's Title VII or ADA claims. Defendants also moved to dismiss the fraud claims. The District Court dismissed one of Stodola's three fraud claims without prejudice, finding that she did not provide information in her Complaint sufficient to comply with the pleading requirements of the Federal Rules of Civil Procedure.

On June 14, 2006, Stodola filed a First Amended Complaint, asserting the same causes of action contained in the original Complaint, and supplementing the allegations underlying the claim of fraud that had been dismissed without prejudice by the District Court. On June 26, 2006, Stodola filed a Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss. On July 14, 2006, Defendants filed a Supplemental Brief on Issues Relating to Plaintiff's Fraud Claims.

On March 22, 2007, the Court Clerk reassigned this case to the undersigned Magistrate Judge upon full consent of the parties.

On April 17, 2007, the Court entered an Order granting in part and denying in part the Motion to Dismiss Stodola's fraud claims.

On December 5, 2007, Defendants filed a Defendants' Motion for Summary Judgment and/or Dismissal, seeking an award of judgment as to all claims pending in this matter. After briefing, on March 24, 2008, the Court issued an Opinion and Order granting in part and denying in part Defendants' Motion. The Court dismissed Stodola's claims for Title VII gender discrimination and defamation and granted summary judgment in favor of Defendants as to Stodola's claims for failure to make a reasonable accommodation, as required by the ADA; retaliation in violation of Title VII and the ADA; and actual and constructive fraud. The Court denied the Motion as to Stodola's claim for ADA disparate treatment discrimination.

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636.

## FACTUAL BACKGROUND

This factual background is reproduced from the Court's March 24, 2008, Opinion and Order that ruled on Defendants' Motion for Summary Judgment and/or Dismissal.

While the parties largely agree as to the facts underlying this case, some details are in dispute. The following facts are taken from the pleadings, the parties' briefing on Defendants' Motion for Summary Judgment and/or Dismissal and Defendants' Motion to Reconsider Summary Judgment Order, and the documents submitted in support of or in opposition thereto. Any facts in dispute are construed in a light most favorable to Stodola, the nonmoving party.

Stodola is a college graduate who holds two degrees in restaurant management from Purdue University. Since earning her degrees in 1993 and 1995, Stodola worked as a cook and later as a manager at several restaurants. Throughout her career, Stodola has suffered from nystagmus, a congenital eye condition resulting from a lack of pigment in the retina and the iris. Nystagmus impairs vision and causes the eye to move in frequent rapid movements in an effort to capture images missed due to the lack of ocular pigment.

At all relevant times, Finley owned and operated twelve Wendy's restaurants in Indiana. Gill and Mills are employees of International Management Company ("International"), an entity that provides management services to Finley. Gill is International's Director of Operations, and Mills

is one of International's District Managers. In November 2003, Stodola contacted Finley in response to an advertisement for employment as a Wendy's manager. Within a week, Defendants arranged for Stodola to interview for a management position. Gill interviewed Stodola for approximately one hour and scheduled a second interview for the next morning. At her second interview, Mills interviewed Stodola. At the end of the interview, Stodola contends that she requested another meeting with Gill to discuss the effect, if any, of her nystagmus on a position with Finley.

On November 12, 2003, Gill met with Stodola for a second time. It was at this meeting that Stodola contends she informed Gill that she had a visual impairment. In addition, Stodola recalls that she showed Gill the specialized telescopic eyeglasses that she wore, and stated that she was concerned about being able to read the computerized customer order display screens used at Wendy's restaurants. Gill assured Stodola that reading the monitors was not an essential function of a manager. Stodola testified at her deposition that Gill then promised that Finley would install screens that displayed larger type. Stodola also contends that Gill promised that Finley would install paper ticket printers so she could access and review customer orders without relying on the monitors.

Stodola elected to visit a Finley Wendy's in Griffith, Indiana to see what she would experience as an employee. Gill testified at deposition that at this visit, Stodola told him that as long as she could wear her special glasses, her ability to view the monitors would not be a problem.

At a subsequent meeting, Stodola raised the issues of salary and work location. According to Stodola's deposition testimony, Gill listed Portage, Chesterton, and Valparaiso as possible work locations. Gill testified that he does not remember having this conversation.

On November 24, 2003, Stodola accepted Defendants' offer of employment as a co-manager trainee. Stodola negotiated one of the highest starting salaries for a co-manager trainee in the history of Finley and was paid as much as some of the Company's general managers. She was assigned to the Finley restaurant in Griffith, Indiana for training. The training program typically lasts ten weeks. Due to what Gill describes as "poor" performance, it took Stodola fourteen weeks to complete the training program. Defs.' Br. Summ. J., Ex. 32 at 3 (Gill Aff. ¶ 10). Stodola completed her training with what she herself described in her final weekly report as a "sub-standard" performance. Defs.' Br. Summ. J., Ex. 19 (Feb. 28, 2004 weekly report).

Following the completion of training, Finley assigned Stodola to an assistant manager position at the Wendy's in LaPorte, Indiana. After two weeks, and at her choice, Stodola transferred to a Michigan City, Indiana Finley Wendy's. Between May 8, 2004, and October 21, 2004, Stodola received five Notices of Needed Improvement, which are forms issued by Finley managers to document employee performance shortcomings. On one occasion, Stodola issued a Notice of Needed Improvement to herself for a cash shortage. The four other notices were issued for slow drive-thru service times.

During this period of time, several general manager positions in the Finley organization became available. Stodola was not promoted to fill any of the openings.

On November 30, 2004, Stodola attended a meeting with Gill and Mills. At the meeting, Gill and Mills informed Stodola that she needed to improve her performance, otherwise Finley would terminate her employment. Stodola attributed her performance problems to her poor eyesight and asked when larger type monitors would be installed. At deposition, Gill testified that this was the

first time he heard Stodola request a larger type monitor.  Gill and Mills agreed to look into a larger

screen.  The meeting concluded with Gill promising to get back to Stodola with his decisions.

On December 3, 2004, Stodola filed a charge of discrimination against Finley with the

Michigan City Human Rights Commission and the Equal Employment Opportunity Commission

(both commissions collectively referred to as "EEOC").  Stodola alleged in the charge that Finley

failed to accommodate her disability and had written her up for reasons associated with her

disability.

Gill sent a letter, dated December 27, 2004, to Stodola outlining his decisions from the

November meeting.  The letter stated that the conditions set forth within were Stodola's last chance

to succeed with Finley.  The letter informed Stodola that she would be reassigned to the Finley

Wendy's in Merrillville, Indiana to work under general manager Mike Sutton.  The letter also

assured Stodola that arrangements had been made for a larger flat-screen monitor to be installed in

the Merrillville restaurant, a task that was completed in mid-January 2005.  The letter set forth a goal

for Stodola to perform at a co-manager level within sixty days.

On January 11, 2005, Stodola filed a second charge of discrimination against Finley with the

EEOC.  Stodola alleged that after Finley had received notice of her first EEOC charge, it crafted a

plan to set her up for termination or force her to quit.  Specifically, Stodola charged that she had

been transferred to the Merrillville Wendy's, which was forty-six miles from her home without

being compensated for additional mileage, and still had not received any accommodations for her

disability.  Stodola also referred to Gill's December letter as evidence of discrimination.

Stodola signed Gill's letter on February 1, 2005, indicating that she had read the letter and understood its contents. She also submitted a written response, in which she denied many of the allegations contained in the letter.

In a memorandum dated March 16, 2005, sent by general manager Mike Sutton to Gill, Sutton wrote that Stodola's strengths were schedules, labor, bills, and week ending. Sutton listed running shifts as Stodola's only weakness. Sutton also wrote that aside from the operational leadership goals, Stodola had accomplished the goals set for her, and that the addition of new screens had improved her work and sped up drive-thru service times. Sutton concluded, however, that Stodola was not operating at a co-manager level, but was operating at an assistant level, and needed at least three additional months of training.

Gill agreed with Sutton's evaluation and, at deposition, testified that following the November 2004 meeting and December 2004 letter, Stodola's performance progressed in certain areas but remained inadequate in others. On March 24, 2005, Defendants terminated Stodola. In a memorandum dated March 24, 2005, from Gill to Stodola, Gill emphasized Stodola's history of performance difficulties. Gill further stated in the memorandum (and later testified at his deposition) that two specific incidents of inadequate performance led to Stodola's termination. First, in March 2005, Gill found Stodola insubordinate for refusing to cook expiring meat. Finley uses fresh meat, and when the meat approaches its expiration date, it is to be cooked for use in chili. On the occasion in question, Stodola failed to cook ninety pounds of expiring meat, which then had to be thrown out.

Second, within days of the insubordinate uncooked meat incident, Stodola was found to have abandoned her job. Each week, Finley district managers go to their assigned restaurants to retrieve Monday paperwork, which is a weekly report that accounts for store inventory, processing, and any

new hires. The paperwork is compiled for each restaurant and sent to Finley's home office. On Sunday March 20, 2005, Stodola was the closing manager at the Merrillville Wendy's and was to complete the Monday paperwork. However, as of the morning of Monday, March 21, 2005, no Monday paperwork had been prepared for the Merrillville Wendy's. Later that week, Defendants terminated Stodola.

On March 28, 2005, Stodola filed a third charge of discrimination against Finley with the EEOC. She alleged that Defendants retaliated against her after she filed her two earlier EEOC charges, and that they failed to accommodate her disability.


## STANDARD OF REVIEW

Motions to reconsider a summary judgment opinion and order can be properly brought pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, which provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed. R. Civ. P. 54(b). The term "judgment" as used in Rule 54(b) "includes a decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a). Motions to reconsider an order under Rule 54(b) are judged by largely the same standard as motions to alter or amend a judgment under Rule 59(e) and serve a limited function: to correct manifest errors of law or fact. *See Rothwell Cotton Co. v.*

*Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (quoting *Keene Corp. v. Int'l Fid. Ins. Co.*, 561

F. Supp. 656, 665-66 (N.D. Ill.1982), aff'd, 736 F.2d 388 (7th Cir. 1984) (citation and footnote

omitted)), amended by, 835 F.2d 710 (7th Cir. 1987).

A motion to reconsider is proper only when:

the Court has patently misunderstood a party, or has made a decision outside the
adversarial issues presented to the Court by the parties, or has made an error not of
reasoning but of apprehension. A further basis for a motion to reconsider would be
a controlling or significant change in the law or facts since the submission of the
issue to the Court.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990).

Accordingly, "motions to reconsider are not appropriate vehicles to advance arguments already

rejected by the Court or new legal theories not argued before the ruling." *Zurich Capital Mkts. Inc.*

*v. Coglianese,* 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005) (citing *Schartle v. Motorola, Inc.*, No.

93 C 5508, 1994 WL 323281 at *1 (N.D. Ill. June 24, 1994)). Nor can motions to reconsider be

employed as a vehicle for introducing evidence that could have been produced prior to the ruling

on summary judgment. *See Rothwell*, 827 F.2d at 251. Thus, "problems [that are appropriate for

reconsideration] rarely arise and the motion to reconsider should be equally rare." *Bank of*

*Waunakee*, 906 F.2d at 1191.[1]


## ANALYSIS

Defendants ask the Court to reconsider its March 24, 2008, Opinion and Order to the extent

that it denied Defendants' Motion for Summary Judgment as to Stodola's claim for ADA disparate

treatment discrimination. Defendants do not specify what Rule of Federal Civil Procedure they use

---

[1]The Court incorporates the summary judgment standard of review set forth in its March 24, 2008 Opinion
and Order into the legal analysis undertaken in this Opinion and Order.

to make the Motion.  Rule 54(b) of the Federal Rules of Civil Procedure allows Defendants to bring the Motion to Reconsider at this juncture.  Pursuant to Rule 54(b), which provides relief from any appealable judgment, decision, or order that adjudicates less than all of the claims when multiple claims are presented, the judgment, decision, or order at issue may be revised at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties.  *See* Fed. R. Civ. P. 54(b).  Thus, because this matter is still pending, Defendants' Motion to Reconsider is timely and the Court construes it as a Rule 54(b) Motion.

In support of the Motion to Reconsider, Defendants contend that the Court misapprehended the direct method of analysis as it applies to Stodola's claim for ADA disparate treatment discrimination.  Defendants argue that under the standard set forth by the United States Court of Appeals for the Seventh Circuit, Stodola has not made a showing sufficient to survive summary judgment and, as a result, the Court should now enter summary judgment in their favor.  In response, Stodola argues that she has produced evidence sufficient to survive summary judgment.

Stodola's claim is based on the ADA's protection of qualified individuals from discrimination "because of the disability of such individual[s] in regard to the job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In Stodola's surviving ADA claim she contends that Defendants treated her worse than other employees due to her disability by subjecting her to unfair discipline for slow drive-thru service times, an unfair performance plan and job transfer, and ultimately terminating her employment.  In response, Defendants contend that their decisions with respect to Stodola's employment were made for legitimate, non-discriminatory reasons.

Stodola may prove disparate treatment discrimination using either the direct method or the *McDonnell Douglas* burden-shifting method, also known as the indirect method. *See McDonnell Douglas v. Green*, 411 U.S. 792, 793 (1973). It was under the direct method of proof that the Court found Stodola's claim defeated summary judgment.

## A. Direct method

Under the direct method, the road less traveled by employment discrimination plaintiffs, the plaintiff must show that an impermissible purpose, the plaintiff's disability for example, motivated the employer to take an adverse employment action. *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001); *Riddle v. Bed, Bath & Beyond, Inc.*, No. 1:06-CV-289, 2007 WL 1597921, at *3 (S.D. Ind. May 31, 2007).[2] The direct method is satisfied if the plaintiff makes a showing through either direct or circumstantial evidence that "will prove the particular fact in question without reliance upon inference or presumption." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 574 (7th Cir. 2001) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)). Here, Stodola is without direct evidence.

Courts recognize the following three types of circumstantial evidence: (1) collective "bits and pieces" evidence that suggests discriminatory motive, such as suspicious timing, ambiguous statements, and problematic behavior toward other employees in the protected group; (2) evidence that similarly situated employees not in the protected group systematically received more favorable treatment; and (3) evidence that the plaintiff was qualified for the job but was replaced by a nondisabled person and that the employer's reason for a difference in treatment is unworthy of belief, or in other words, is pretext. *See Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772,

----

[2]Here, Defendants did not challenge Stodola's "disabled" status or that she suffered an adverse employment action.

782 (7th Cir. 2007); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The focus of the direct method of proof is whether the evidence "points directly" to a discriminatory reason behind the employer's action. *Atanus v. Perry*, 520 F.3d 662, 672-77 (7th Cir. 2008) (citations omitted). If a plaintiff introduces circumstantial evidence that would allow a reasonable jury to find that the employer acted for a discriminatory reason, the plaintiff succeeds under the direct method. *See Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 904-05 (7th Cir. 2006).

In their Motion to Reconsider, Defendants separate their analysis of each alleged adverse employment action (the disciplinary Notices, the performance improvement plan, and the termination) and the evidence that Stodola contends supports finding that discrimination led to each action.[3] This form of analysis is a departure from that the Court engaged in to reach its March 24, 2008 ruling on summary judgment. In its Opinion and Order, the Court engaged in a combined analysis of the three adverse employment actions and the circumstantial evidence offered by Stodola in support of finding that discrimination led to the actions. Under the analysis now advocated by Defendants, the burden on Stodola is significantly higher. She must point to evidence directly suggesting that her disability motived each adverse action taken against her. Defendants fail to provide any supporting law for this form of analysis. Nevertheless, the Court now considers whether the proper analysis in this case is a separate evaluation of each adverse employment action or a combined evaluation of all the adverse employment actions.

---

[3] In summary judgment briefing, Defendants did not separate the alleged adverse employment actions in their analysis of Stodola's claim of ADA disparate treatment. Stodola has consistently analyzed her discipline, transfer, and discharge together, combining her analysis of the actions to support one general argument that Defendants discriminated against her.

The Court first considers whether the actions complained of by Stodola are factually distinct. *See Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 611 n. 4 (1st Cir. 2000) (citations omitted) (engaging in a *McDonnell Douglas* employment discrimination analysis, the United States Court of Appeals for the First Circuit noted, "Because the alleged adverse employment actions are factually distinct, we will analyze them separately . . .").[4] Here, Stodola complains of discipline, a job improvement plan, and termination. Each action is separate in terms of timing. Defendants issued the disciplinary notices between May 8, 2004 and October 21, 2004; issued the performance improvement plan on December 27, 2004; and terminated Stodola on March 24, 2005. The actions are also separate in their effect on Stodola's employment. Although they led to a single final result, each action had a different, progressively escalating, effect. Further, Stodola filed a separate charge with the EEOC in response to each action. Her first charge specifically complained of discipline, the second charge complained of the job improvement plan, and the third charge complained of the termination. Also, Defendants contend that each action, while precipitated by a common theme of inadequate performance, was caused by distinct performance shortcomings. Finally, as analyzed below, Stodola, to a large degree, relies on separate evidence to show that discrimination caused each action. It is thus clear that the actions complained of are factually distinct.

---

[4]Unfortunately, Stodola's First Amended Complaint is not very helpful in determining whether the actions are distinct. Although she alleges "discrimination . . . on account of disability[,]" the only ADA allegation clearly outlined in the pleading is the claim that Defendants failed to provide a reasonable accommodation, for which the Court granted Defendants' Motion for Summary Judgment. Am. Compl. at ¶ 1. The First Amended Complaint outlines the three specific adverse employment actions the Court analyzes below within a section detailing Stodola's Title VII claim, which she has since abandoned. However, under the liberal federal pleading standards, the Court analyzes those actions as the basis for an ADA claim.

The Court now turns to the language of the ADA for aid in determining whether to analyze the complained of actions separately or in combination. Defining "discriminate," the ADA provides the following seven examples of discrimination:

**(1)** limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

**(2)** participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

**(3)** utilizing standards, criteria, or methods of administration–
**(A)** that have the effect of discrimination on the basis of disability; or
**(B)** that perpetuate the discrimination of others who are subject to common administrative control;

**(4)** excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

**(5)(A)** not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
**(B)** denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

**(6)** using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and

is consistent with business necessity; and

**(7)** failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

42 U.S.C. § 12112. The examples of discrimination set forth by statute do not resolve whether, in a case presenting multiple adverse employment actions, the actions should be analyzed separately or in combination. Each form of discrimination listed above could be carried out through either a single adverse action or a series of adverse actions.

Another relevant source to consider is the Federal Civil Jury Instructions of the Seventh Circuit. Within the section of instructions devoted to ADA claims, Instruction 4.01, outlining the requirements of a plaintiff's claim, provides, "Plaintiff claims that Defendant discriminated against him by [not hiring/not promoting/firing him because he had a disability]." Fed. Civil Jury Instruction of the Seventh Circuit § 4.01 (2005). In describing the basis of a disparate treatment ADA claim, Instruction 4.02 requires that the parties provide the following information: "Defendant [describe adverse employment action] Plaintiff[.]" *Id*. at § 4.02. The language of the pattern circuit jury instructions does not resolve the issue under consideration but it makes clear that a plaintiff can submit an ADA disparate treatment case to a jury based on any one of a number of types of adverse employment actions.

Turning to relevant case law, in the context of an indirect *McDonnell Douglas* discrimination analysis, in cases when a plaintiff has alleged multiple adverse employment actions, the Seventh

Circuit has separately analyzed each action for evidence of discriminatory motivation. *See Atanus*, 520 F.3d at 672-77. Courts in other circuits that have analyzed cases presenting multiple adverse employment actions using the indirect method also separated their analysis of each action. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 217-24 (2d Cir. 2005) (separating analysis of Title VII termination and Title VII failure to promote claims); *Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 844-49 (D.C. Cir. 2001); *Alexander v. Principi*, 16 Fed. Appx. 755, 757 (9th Cir. 2001).[5, 6]

Under the *McDonnell Douglas* analysis, separating each alleged adverse employment action is a logical choice. Showing that she suffered an adverse action is one of the required elements to satisfy a plaintiff's initial burden. Thus, separating each alleged adverse employment action for analysis allows a court to determine whether the plaintiff can demonstrate this necessary element. Of importance to this Court's current consideration, the direct method of proof also requires a plaintiff to show that an adverse employment action occurred. *See Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006).

Also significant in the relevant Seventh Circuit case law is that after finding that an adverse employment action occurred, in a recent case, the Seventh Circuit continued its separate analysis and considered whether enough evidence existed to show that discrimination may have caused each adverse action. In *Atanus*, the plaintiff alleged that she suffered four adverse employment actions. The court found the first action to be legally adverse. *See* 520 F.3d at 673. After reaching this

---

[5]In a similar analysis, the Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White*, considered whether each of two alleged retaliatory actions were separately "materially adverse," which is the standard required to sustain a claim of retaliation under Title VII. 548 U.S. 53, 70-73 (2006).

[6]In *Drury v. Schoessow*, the court analyzed two alleged discriminatory employment actions separately, the first under the direct analysis and the indirect analysis, the second under only the indirect analysis. No. 05-C-956, 2007 WL 2318521, at *5-7 (E.D. Wis. Aug. 8, 2007).

threshold finding, the court continued in a separate analysis of the evidence that the plaintiff alleged caused each adverse employment action. *See id.* at 673-78. The court did not combine its analysis of all four actions to determine whether enough aggregate evidence existed to find discriminatory animus. The court's analysis thus supports separately examining each adverse employment action for discriminatory motivation.

Based on the foregoing analysis, the Court now corrects the analysis in its March 24, 2008 Opinion and Order, and considers Stodola's claim of ADA disparate treatment separately as to each alleged adverse action. Stodola is required to produce sufficient circumstantial evidence to support allegations that her disability motivated each adverse action.

### 1. Notices of Needed Improvement

Stodola contends that Defendants issued Notices of Needed Improvement to her as punishment for slow drive-thru times but did not similarly discipline other non-disabled employees. In support of this claim, Stodola refers to a number of paragraphs from her Statement of Material Facts that are supported only by her deposition testimony. The cited deposition testimony alleges that one of the managers who disciplined Stodola, Vannan Smith, told Stodola that she had been instructed to do so by Mills. Stodola also testified that she observed employees John Bridges, Mike Montgomery, Matt Wilhelm, Carrie Balboa, LaTonya Vann, and Mike Sutton exceed drive-thru time goals without being disciplined. Stodola contends that Bridges, Montgomery, Wilhelm, and Chad Styers were in charge of Finley stores that did not meet drive-thru time goals and they were not disciplined. Stodola further alleges that she saw manager reports showing that Vann's drive-thru service times were above the company's goal time and yet Vann was promoted to co-manager.

A plaintiff may defeat summary judgment by relying on her own deposition testimony. *See Paz v. Wauconda Healthcare & Rehab. Centre, LLC*, 464 F.3d 659, 664-65 (7th Cir.2006); *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir.2003). However, the evidence presented by affidavit or deposition must meet the usual requirements for evidence at the summary judgment stage. *Payne v. Pauley*, 337 F.3d 767, 771-73 (7th Cir. 2003). Here, Stodola is able to provide specific information in her deposition testimony as to other employees who she contends did not meet the service time goals but were not disciplined. She thus establishes evidence of different treatment. But Stodola is unable to make the next link in the chain of evidence required by the direct method. She cannot identify any evidence that points to her disability being the motive for Defendants choosing to discipline her.

Although not asserted by Stodola, the Court now considers timing, a form of evidence frequently relied on by employment discrimination plaintiffs.[7] In summary of the legal standard of timing as evidence, which was set forth fully in the Court's March 24, 2008 Opinion and Order, generally, "[s]peculation based on suspicious timing alone . . . does not support a reasonable inference of discrimination." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). "[A]s the temporal distance between [the] protected expression and the adverse action increase[s], it is less likely that there is a causal link between the two events." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996). A sudden change in an employer's attitude toward an employee upon disclosure that the plaintiff has a disability may raise an inference of discrimination if the

---

[7]Timing can be used by plaintiffs as supportive evidence of discrimination in disparate treatment claims, *see Atanus*, 520 at 672, and retaliation claims, *see Reed v. Innovative Health & Fitness Ltd.*, 259 Fed. Appx. 875, 877-78 (7th Cir. 2008). Here, the Court analyzes whether timing supports Stodola's claim of ADA disparate treatment discrimination.

plaintiff is able to establish that the disclosure was the only intervening event. *See Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998).

Here, Stodola contends that the first discriminatory action taken against her was a Notice of Needed Improvement issued on May 8, 2004. Between November 2003, when Stodola contends she informed Defendants of her disability, and May 8, 2004, no action (such as the filing of an EEOC charge) occurred with respect to Stodola's impairment.[8] The six months that passed before the issuance of the first Notice of Needed Improvement is such that any temporal link between Stodola's disability and the discipline is weak. *See Franconi v. Hartmarx Corp.*, 300 F.3d 767, 773 (7th Cir. 2003) (citations omitted) ("six months is too long to establish a causal link without more"). In sum, Stodola's testimonial evidence that she was disciplined and other non-disabled employees were not does not establish that her disability motivated the discipline and therefore does not pass muster under the direct method.

*2. Performance improvement plan*

Stodola next contends that as a result of her disability, Defendants issued a performance improvement plan in the hopes of forcing her to quit. As evidence that discrimination motivated this act, Stodola points to the timing of events that led to the issuance of the plan. The timing of events is as follows: Stodola met with Gill and Mills on November 30, 2004, and during their meeting discussed her disability and the need for a larger monitor that would allow her to view customer orders. On December 3, 2004, Stodola filed a charge of discrimination with the EEOC, complaining of disability discrimination. On December 13, 2004, Defendants allegedly received service of the EEOC charge. On December 27, 2004, Gill issued the performance plan, pursuant to which

---

[8]Stodola filed her first EEOC charge on December 3, 2004.

Defendants transferred Stodola to the Merrillville Wendy's and gave her sixty days to improve her performance or face termination.

Fourteen days separated Defendants' receipt of Stodola's first EEOC charge and the issuance of the performance improvement plan. The EEOC charge was not Defendants' first notification of Stodola's disability, thus, news of Stodola's visual impairment was not a surprise upon receipt of the charge. The original notice came on November 12, 2003, when in an interview with Gill, Stodola contends she discussed her visual impairment. However, the fact that Defendants previously knew of Stodola's disability does not wash the timing of events in this case of any inference of discrimination. Defendants previously issued warnings (Notices) to Stodola but never took any tangible action against her. It was only after Stodola filed a charge with the EEOC that Defendants found it necessary to take action and transfer her as part of a performance improvement plan that could lead to her termination.

Were the December 3, 2004, EEOC charge and the November 30, 2004, meeting the only documented incidents related to Stodola's employment and performance that occurred prior to her December 27, 2004 transfer, an inference of discrimination might exist. However, that is not the case. As of the issuance of the performance plan, Stodola had received five Notices of Needed Improvement. Further, at the November 30, 2004 meeting, by Stodola's own admission, Defendants raised her performance as an issue affecting her employment and informed her that she needed to improve. Clearly, performance was an issue affecting Stodola's employment prior to her December 3, 2004, EEOC charge. Her evidence of temporal proximity is alone insufficient to establish that Defendants issued the performance improvement plan because of her disability. As a result, Stodola

fails to establish a case of discrimination for her performance improvement plan under the direct method.

*3. Termination*

Finally, Stodola contends that discrimination motivated Defendants to terminate her employment. Stodola contends that Defendants' stated reasons for her termination are pretext. Pretext is defined as "a deliberate falsehood." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (citations omitted). "An honest mistake, however dumb, is not [pretext], and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage." *Id.* Only the honesty of the employer's stated reason for the adverse action is of concern to the court at summary judgment. *See id.* (citing *Balderston v. Fairbanks Morse Engine Div.*, 328 F.3d 309, 323 (7th Cir. 2003)). "If the stated reason is not the actual one, it is a pretext even if it had some basis in fact-even if it might have induced some employers to fire or take other adverse action against the plaintiff but did not induce this employer to do so." *Forrester*, 453 F.3d at 419.

Justifying the termination, Defendants point to Stodola's employment record and contend that she had a lengthy history of unsatisfactory job performance. Defendants rely on a letter dated December 27, 2004, sent by Gill to Stodola, placing her on a performance plan and transferring her to the Merrillville Wendy's. Defendants contend that the letter, and the following excerpt in particular, evidences a history of problematic work performance:

> Based on your experience in the restaurant industry, I expected you to be farther along at this time. . . I am speaking specifically of leadership. i.e., taking initiative, setting the example for subordinates, picking up administrative tasks with out [sic.] being asked, running an effective shift on a consistent basis. This year we rolled out the Operations Leader Program. . . . You struggle with the premise as others do; however, you are not making steady improvement with this program at the same pace as others. . . . After measuring both your goals and that of our company, [Mills] and I have developed the basics of a plan we believe will address both of our needs. . .

. [I]t is you who must execute the plan to succeed and remain employed with our company. . . . [T]his is the final opportunity to succeed at Wendy's.  Absent success in this endeavor the employment relationship will be terminated.

Defs' Br. Summ. J., Ex. 26, 1-3.  Gill asserts that the history summarized in the letter was the backdrop but that he made the decision to end the parties' employment relationship based on two misdeeds by Stodola: an act of insubordination (failing to cook expiring meat), and an act of job abandonment (failing to complete the Merrillville Wendy's Monday paperwork).

Stodola vigorously argues that Defendants' stated reasons for her termination are pretext, and points to a conflict in explanations offered at different times by Defendants.  In a letter dated July 13, 2005, Carmen Wolfe, an EEOC investigator, wrote to Shaw R. Friedman, who was then legal counsel for Stodola.  In the letter, Wolfe included Defendants' EEOC Position Statement, which she represented had been sent to her under separate cover by counsel for Defendants.  Within the Position Statement, Defendants' counsel referred to on the job performance issues and summarized Stodola's termination as follows: "It is this type of misconduct together with Ms. Stodola's unwillingness or inability to meet the goals and objectives of the performance improvement plan that resulted in the decision of Mr. Gill to terminate the employment relationship."  Pl.'s Resp. Br. Summ. J., Ex. 5, 16.  Stodola contrasts that statement with a quote contained in Defendants' brief in support of summary judgment.  Defendants quote Gill's deposition, taken on September 11, 2007, in which he said, "She wasn't fired for not doing her [performance improvement] plan.  She was fired for abandonment of job . . ." Defs.' Br. Summ. J. at 7 (quoting Gill Dep. at 68).

That Defendants offer several reasons for Stodola's termination does not alone show pretext.  However, stated reasons  in conflict with each other may cast sufficient doubt upon a defendant's

purported justifications to allow a plaintiff's claims to survive summary judgment. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 676-78 (7th Cir. 2003) (the court found the defendant's two independently legitimate reasons for failing to rehire the plaintiff unworthy of credence, in part because the reasons were inconsistent, but also due to the defendant's timing in disclosing its second justification, which for the first time was asserted in defendant's summary judgment reply brief); *Creal v. Springhill Ford, Inc.*, No. 06 C 0175, 2007 WL 3120106, at *6 (N.D. Ill. Oct. 19, 2007) (". . . given that an employer can terminate an employee for multiple, legitimate reasons, the fact that the record contains more than one statement of why [the plaintiff] was fired only helps [the plaintiff] if those statements are inconsistent with one another or the underlying facts in such a way as to suggest a lie").

Both reasons for Stodola's termination offered by Defendants concern job performance. Neither reason is itself discriminatory or unreasonable. The explanations were offered by different company representatives at different times. Had the same person made the statements or had the statements been made by different people at the same time, the inconsistencies would be more persuasive. Also, the first statement by legal counsel cites "misconduct" as a reason, among several, for termination. This is consistent with the reason for termination identified in Gill's testimony. That said, Gill's statement at deposition that Stodola was not fired because she failed to comply with the performance plan contradicts Defendants' representation in their Position Statement through legal counsel that Stodola was fired because she did not comply with the performance plan. The presence of directly inconsistent statements raises a question as to their truthfulness. To date, the contradiction has not been resolved. The Court previously found that the specter of pretext lingers,

and still finds that statement to be true today. However, the specter resulting from the explanations must be supported by additional circumstantial evidence to satisfy the direct method of proof.

In addition to Defendants' inconsistent justifications, Stodola points to the "suspicious" timing of her termination. The timing of events leading to the performance improvement plan is summarized above. Following the issuance of the plan, on January 11, 2005, Stodola filed a second EEOC charge, complaining that the performance plan was an act of retaliation. On March 20, 2005, Defendants terminated Stodola's employment.

The more than two months that passed following Stodola's filing of her second EEOC charge and her termination largely cleanses the timing of her termination of any taint of discrimination. *See Bilow v. Much Shelist*, 277 F.3d 882, 895 (7th Cir. 2001) (two months passed between an alleged protected activity and the plaintiff's discharge, and the court found that without other suspicious circumstances indicating that the actions were related, there was not sufficient evidence to establish a connection between the two acts). Further, intervening acts occurred. In the two months between the second EEOC charge and Stodola's termination, Mike Sutton supervised Stodola. Sutton commented favorably about some aspects of her work, but in a memorandum dated March 16, 2005, Sutton commented that Stodola needed three more months of training before she would be ready to be a co-manager. Three additional months of training would have extended Stodola's training into mid-June, well after the sixty day time frame allotted in the November 30, 2004 performance plan for Stodola to perform as a co-manager. Based on the foregoing, the direct evidence points to Stodola being terminated for her performance, not her disability. While Defendants' evidence is not entirely linear, Stodola has not introduced sufficient evidence to show that Defendants terminated her due to her disability.

## B. Indirect method

In its March 24, 2008 Opinion and Order, the Court did not engage in an indirect method analysis, finding it unnecessary because it had found that Stodola succeeded under the direct method. Now that the Court's finding as to the direct method has been reconsidered and a different outcome arrived at, the Court proceeds with an analysis under the indirect method.

Under the indirect or *McDonnell Douglas* burden shifting method, the plaintiff must show: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations with regard to the franchise agreement; (3) she suffered an adverse action; and (4) similarly-situated non-protected individuals were treated more favorably. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830 (7th Cir. 2007). If the plaintiff is unable to establish a single element of the prima facie case, summary judgment must be entered in favor of the defendants. *See Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 676 (7th Cir. 2006).

It is uncontested that Stodola can establish the first and third elements of her prima facie claim. Defendants chose not to challenge Stodola's status in a protected class of disabled individuals, and that she suffered adverse employment actions.[9]

Having sailed smoothly through the first and third elements, Stodola's prima facie case changes course and hits rough water in her attempts to show that she satisfactorily performed her job and that similarly situated non-protected individuals were treated more favorably. To the first showing, Stodola's performance history is by now well documented. Stodola contends that the four

---

[9]After engaging in an analysis above as to whether it is proper for the Court to analyze adverse employment actions separately or in combination, and concluding that they should be analyzed separately, the Court now, in this indirect method analysis, engages in a combined analysis of the discrimination alleged by Stodola. The Court does so because, as set forth below, Stodola is unable to establish two elements of the prima facie case and those elements are unaffected by a separate versus a combined analysis.

Notices of Needed Improvement issued for slow drive-thru performance time were themselves discriminatory and that Defendants did not punish other employees performing in a similarly slow manner. This is a legally significant point. When a plaintiff alleges discriminatory discipline, as Stodola does here, "the second and fourth prongs of *McDonnell Douglas* merge." *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). The analysis of the employer's expectations fall away and the court considers whether the plaintiff received treatment more harsh than that received by a similarly situated employee who is outside the protected class. *See id.* Here, Stodola alleges discriminatory discipline as well as other discriminatory actions. As a result, the Court will complete the analysis of the second prong for purposes of the other discriminatory actions before moving on to the fourth prong for purposes of all discriminatory actions.

Returning to the Notices issued due to slow performance time, Stodola does not quarrel with their substance, thereby seemingly admitting that she was a slow performer. With regard to the fifth Notice, Stodola does not argue that the self-issued demerit was an act of discrimination, nor could she. During her employment, other performance issues arose. In her initial training program, which was scheduled to last ten weeks, Stodola took fourteen weeks to complete the program and finished her training with a self-described sub-standard performance. Defendants contend that two performance based issues ultimately led to Stodola's termination: one incident of failing to follow company protocol with regard to cooking meat, and one incident of job abandonment. Stodola attempts to factually justify both acts but does not dispute the fact that they occurred. Stodola also contends that these incidents were pretext for her firing but in both explanations offered by Defendants, performance is mentioned as a factor leading or contributing to her termination. Based

on her employment history, Stodola cannot show that she met her employer's legitimate expectations.

For the last element of Stodola's required showing, the Court must look to all relevant factors, a number of which are case specific. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Here, case law dictates that because Stodola's allegations include a claim that she was unfairly disciplined, she must demonstrate that she is similarly situated to a non-protected individual with regard to performance, qualifications, and conduct. *See id.* (citing *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995)). This entails a showing that the two employees had the same supervisor, were subject to the same standards, and engaged in similar conduct without differentiating or mitigating circumstances that would distinguish the employer's treatment of the employees. *See Radue*, 219 F.3d at 617 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "[T]he other employee[] must have engaged in similar-not-identical-conduct to qualify as similarly situated." *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005).

In her summary judgment briefing and briefing of the instant Motion, Stodola compares herself to one employee, Jon Raddatz. Despite it being Stodola's burden to establish a comparative employee, Defendants introduced the majority of the information in the record about Raddatz. Perhaps it worked to their advantage. According to Defendants' briefing, in August 2004, Finley promoted Raddatz to a general manager position after he had worked for the Company for five years. Raddatz had previously worked as a crew person, a shift manager, an assistant manager, and a co-manager. Defendants maintain that Raddatz performed successfully at all levels within the organization. Defendants further represent that shortly before August 2004, Raddatz successfully completed Mike Sutton's Merrillville store-based training program. Defendants contend that by

comparison, in August 2004, Stodola still had not completed Mike Sutton's program and was not performing satisfactorily at a co-manager level.

In response, Stodola contends that Defendants failed to show that Raddatz had to work without a headset or a ticket printer (accommodations which Stodola requested or contends she was promised by Gill or Mills and did not receive until January 2005) and thus Defendants failed to show that Raddatz worked under similar circumstances. However, this is not Defendants' burden. Even so, in their reply brief in support of summary judgment, Defendants provided a checklist of the similarities between Stodola's and Raddatz's employment with Finley. Defendants contend that both Stodola and Raddatz received a written performance improvement plan, both were temporarily transferred to the Merrillville store for training, both were placed in training under the tutelage of Mike Sutton, both were assigned a training checklist intended to move them to a general manager position, both were required to drive to and from work, and both were not paid for mileage to and from work.

Stodola does not point to evidence to rebut Defendants' comparison but instead implores the Court to engage in an inquiry into possibilities. Stodola proposes that Raddatz "may have been [given] a different version of [the training checklist] used for Stodola," may have been promoted in a shorter time than Stodola was allowed to work on her performance improvement plan, or may have performed in a deficient manner (as Stodola explains, "We don't know how Raddatz did with running crews . . . we don't really have the record of Raddatz's training"). Pl.'s Resp. Br. Mot. to Reconsider at *5. At summary judgment, a plaintiff is required to show more than conjecture or speculation. *See Anders*, 463 F.3d at 676-77 (citing *Crawford v. Ind. Harbor Belt R.R.. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)). Stodola has no evidence establishing that Raddatz engaged in any

acts of misconduct, similar to Stodola's or not, for which Defendants failed to impose discipline. Thus, she cannot make the predicate showing that she and Raddatz engaged in similar conduct. Without making this showing, Stodola cannot show that Defendants treated Raddatz more favorably than they treated her. Had Defendants not provided information about Raddatz in their summary judgment briefing, the Court would be left with little, if any, reference regarding his role within the Company. Defendants introduced general information but stopped short of making Stodola's required showing that she and Raddatz had comparative disciplinary backgrounds. Stodola's attempt to make the required showing through speculation fails. Having failed to establish prima facie elements two and four, Stodola cannot succeed in establishing a claim of ADA disparate treatment discrimination using the indirect method.

## CONCLUSION

Therefore, the Court hereby **GRANTS** the Defendants' Motion to Reconsider Summary Judgment Order [DE 49]. The Court **ORDERS** that judgment be entered in favor of Defendants Finley & Company, Inc., Dennis Gill, and Allan Mills, and against Plaintiff Madeleine Stodola on the remaining claim in her First Amended Complaint.

All pretrial and trial dates are **VACATED**.

SO ORDERED this 21st day of August, 2008.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record